## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| **v.** | **Case No. 1:00-cr-157-RCL** |
| **KENNETH SIMMONS** | |
| **RONALD ALFRED** | |
| **JAMES ALFRED** | |
| **FRANKLIN SEEGERS** | |
| **DEON OLIVER** | |
| *Defendants*. | |

### <u>MEMORANDUM OPINION</u>

Nearly twenty years ago, this Court presided over a lengthy trial involving Kenneth Simmons, Ronald Alfred, James Alfred, Franklin Seegers, and Deon Oliver, among others, who were indicted for a massive drug conspiracy centered in Washington, D.C. A jury convicted them of a variety of crimes, including conspiracy to distribute and possess with intent to distribute a controlled substance. In finding the defendants guilty on the drug conspiracy count, the jury concluded that certain drug quantities were attributable to each defendant, which in turn impacted the applicable sentences. On appeal, the D.C. Circuit concluded that the admission of certain evidence—specifically several Drug Enforcement Administration ("DEA") drug analysis reports, a summary chart derived from the reports, alongside testimony by a supervisory chemist (collectively the "DEA-7 evidence")—violated the Confrontation Clause of the U.S. Constitution. *United States v. McGill*, 815 F.3d 846, 890-92 (D.C. Cir. 2016) (per curiam). And because the DEA-7 evidence could have been used by the jury to help identify the drug quantity attributable

1

to each defendant, the Circuit remanded to this Court for a determination of whether "there is a reasonable probability that, but for the improperly admitted evidence, the jury's quantity findings would have been different." *Id.* at 892. In other words, that it "affected the outcome of the district court proceedings." *Id.* at 890 (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

After review of the defendants' briefing, the government's response, the applicable law, and the trial record, this Court concludes that no defendant has met his burden to demonstrate such a reasonable probability.

## I.    BACKGROUND

The Court will focus narrowly on the background and procedural history relevant to the remand. All of the defendants here were indicted and later convicted of counts arising out of "a large-scale and violent narcotics-distribution business centered in Washington, D.C." *Id.* at 861. Due to the difficulties with trying all related defendants in a single trial, the charged conspirators were split into two groups and tried separately. The first group was tried first in a yearlong trial and those defendants were part of a separate appeal. *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011), *aff'd in part sub nom*. *Smith v. United States*, 568 U.S. 106 (2013). That group included both Kevin Gray and Rodney Moore, who led the criminal enterprise. *McGill*, 815 F.3d at 861. The present appeal includes only defendants from the second group, who were tried together over the course of six months, with dozens of government witnesses, including many cooperating former coconspirators. *See id.* at 861-63; Gov't Opp'n 8, ECF No. 2830.

The D.C. Circuit largely affirmed the defendants' convictions on appeal. *McGill*, 815 F.3d at 861-62, 947. However, it reversed and remanded to this Court based in part on the improper

admission of the DEA-7 evidence.[1]   *Id.* at 890-92, 947.   The improperly admitted chart, summarizing the improperly admitted evidence, is reproduced below.

JW-1

### DEA LABORATORY ANALYSIS OF DRUG EVIDENCE

| Date of Recovery | DEA-7 Exhibit No. | Site/Circumstances of Recovery | Lab No. | Result of DEA Analysis |
|---|---|---|---|---|
| 8/6/89 | RA89-501 | Arrest of Ronald Alfred by U.S. Park Police | Z-7542 | 997.9 grams of a substance containing cocaine hydrochloride |
| 2/11/93 | FS93-501 | Franklin Seegers's undercover buy – drugs found on Seegers | FB-313 | 1.609 grams of a substance containing cocaine base (8 ziplocks) <br><br> 1.755 grams of a substance containing cocaine hydrocholoride (33 ziplocks) |
| 2/11/93 | FS93-502 | Franklin Seegers's undercover buy – drugs sold to undercover | FB-466 | 0.142 grams of a substance containing cocaine base. |
| 7/11/96 | SW-SS-501 | Search warrant executed at 8560 Second Avenue, Apt. 707, Silver Spring, MD | 55691 <br> 55692 <br> 55693 | 497.4 grams of a substance containing cocaine base <br> 478.3 grams of a substance containing cocaine hydrochloride <br> 9.25 grams of a substance containing cocaine base |
| 7/11/96 | SW-SS-502 | Search warrant executed at 8560 Second Avenue, Apt. 707, Silver Spring, MD | 55694 <br> 55695 | Residue on paper bag and plastic bag contains cocaine base |
| 11/25/96 | D96-FS-501 | Search of Diane Luther's apartment at 1907 Maryland Avenue, N.E., Apt. 12 | GW-356 | 3.6 grams of a substance containing heroin hydrochloride, quinine, and procaine (68 ziplocks) |

### DEA LABORATORY ANALYSIS OF DRUG EVIDENCE

| | | | | |
|---|---|---|---|---|
| 11/30/96 | D96-FS-501 | Search warrant executed at 1635 Holbrook Street, N.E. | GW-356 | 0.74 grams of a substance containing heroin hydrochloride, cocaine, quinine and procaine (5 ziplocks) <br><br> 4.6 grams of a substance containing cocaine and quinine (1 ziplock) <br><br> 14.4 grams of a substance containing heroin hydrochloride, cocaine, lidocaine, and procaine (1 plastic bag) <br><br> 4.2 grams of a substance containing heroin hydrochloride, cocaine, quinine and procaine (27 ziplocks) <br><br> 21.9 grams of a substance containing cocaine hydrochloride (1 plastic bag) <br><br> 3 grams of a substance containing heroin hydrochloride, cocaine, lidocaine and procaine (1 plastic bag) |
| 1/31/97 | DO97-501 | Arrest of Deon Oliver | GW933 | 5.4 grams of a substance containing cocaine base (50 ziplocks) <br><br> 3.1 grams of a substance containing cocaine base (25 ziplocks) |
| 1/2/98 | RS-504 | Arrest of Timothy Handy at 1275 16th Street, N.E., Apt. A | HH-968 | 4.3 grams of a substance containing cocaine base (49 ziplocks) |
| 7/2/99 | SW-LP-501 | Search warrant executed at Helen Clyburn's house at 647 Lexington Place, N.E. | W7808 | 44.4 grams of a substance containing heroin hydrochloride, 06-monoacetylmorphine, morphine, codeine, procaine and phenylpropanolamine |

---

[1] The Circuit also remanded for this Court to (1) examine ineffective assistance claims by Kenneth Simmons and Ronald Alfred and (2) resentence Keith McGill.  *McGill*, 815 F.3d at 947.  That part of the remand is not the subject of this opinion.

*See* ECF No. 2804-1.  The Circuit concluded that the DEA-7 evidence was improperly admitted because the government was required to call an authoring chemist in order to admit the reports and chart, rather than a supervisory one.  *McGill*, 815 F.3d at 890-92.  However, because the defendants did not make this objection at trial, the D.C. Circuit reviewed the issues under the plain-error standard.  *Id.* at 890-92, 947.

Applying the plain-error standard, the Circuit almost entirely rejected the defendants' application to vacate their substantive convictions due to the Confrontation Clause violation.[2]  The defendants had argued that "apart from the improperly admitted drug report evidence, 'there was no tangible proof, other than testimony by highly impeached cooperating witnesses, as to the nature and scope of the conspiracies at all.'"  *Id.* at 891 (citation omitted).  But the Circuit did not accept that argument, reasoning that "the jurors could not have believed that appellants were going through the elaborate transactions and precautions described, and exchanged the funds described, for any reason other than conspiracy to distribute and possess narcotics" and that therefore, the "[defendants] ha[d] not carried th[eir] burden as to any elements except (possibly) drug quantity."  *Id.* at 892.  The Circuit further stated, in rejecting the effect of any cumulative errors, that "[t]he government mounted a strong case based on overwhelming evidence."  *Id.* at 947.

The Circuit's reference to "drug quantity" refers to the findings that were part of the jury's verdict on the drug conspiracy charge for each defendant.  *Id.* at 892.  When a defendant is charged with conspiring to distribute and possess with intent to distribute a controlled substance, the jury

---

[2] The one exception was for Franklin Seegers.  The government conceded that two charges for possession with intent to distribute cocaine and heroin could not stand given the Confrontation Clause violation.  *McGill*, 815 F.3d at 890.  The Circuit therefore reversed Franklin Seegers's convictions on those two charges.  *Id.*

must make specific findings as to the quantity of drugs attributable to each defendant. *See id.* That quantity then determines the applicable sentencing range.[3] *Id.*

To illustrate the jury's role in determining the applicable drug quantity amount, consider the verdict form for defendant Ronald Alfred on the issue of powder cocaine. The jury had to make the following determination:

<u>Cocaine</u>

(A) 5 kilograms or more of mixtures and substances containing a detectable amount of cocaine.

Proven ___✓___        Not Proven ___

If you are unable to find unanimously that the quantity of cocaine was 5 kilograms or more, then you should consider whether the drug quantity was:

(B) 500 grams or more but less than 5 kilograms of mixtures and substances containing a detectable amount of cocaine.

Proven_____        Not Proven_____

ECF No. 1880 at 2. That finding represents the jury's determination of the amount of powder cocaine individually attributable to Ronald Alfred based on the evidence presented at trial.

The Circuit concluded that the improperly admitted DEA-7 evidence might have affected the jury's findings for the drug quantity attributable to each defendant. *McGill*, 815 F.3d at 892. The panel therefore remanded to this Court to evaluate the issue and "depending on which counts or quantity findings (if any) are vacated with respect to each appellant . . . determine in the first instance whether resentencing is appropriate." *Id.* In so doing, the Circuit explained that "[o]n remand the burden will be on [defendants] to show, perhaps through additional briefing, that there

---

[3] For a drug quantity to be attributable, the government must prove that each defendant "entered the conspiracy to distribute not just an indeterminate amount of [drugs]," but rather that the attributable quantity was "reasonably foreseeable, or within the scope of the conspiracy entered by a *particular* defendant." *United States v. Stoddard*, 892 F.3d 1203, 1219 (D.C. Cir. 2018) (emphasis added). That is, the inquiry is as to the individual defendant, and the drug quantity that can be attributed to him based on what was reasonably foreseeable to him, rather than "the amount of drugs attributable to the conspiracy as a whole." *Id.* at 1220.

is a reasonable probability that, but for the improperly admitted evidence, the jury's quantity findings would have been different." *Id.*

The defendants subsequently filed memoranda, motions, and briefs on remand. James Alfred and Deon Oliver filed briefs on remand arguing that the jury's drug quantity findings as to them would have been different without the DEA-7 evidence. Def. James Alfred Br., ECF No. 2796; Def. Deon Oliver Br., ECF No. 2804. Franklin Seegers filed a memorandum in support of his resentencing. Def. Franklin Seegers Mem., ECF No. 2799. Ronald Alfred filed a brief on remand and moved for resentencing. Def. Ronald Alfred Mot., ECF No. 2826. Kenneth Simmons moved to dismiss several of the substantive counts of conviction. Def. Kenneth Simmons Mot., ECF No. 2822.

The United States then filed an omnibus response to the defendants' various filings. Gov't Opp'n. James Alfred and Dean Oliver replied. Def. James Alfred Reply, ECF No. 2832; Def. Deon Oliver Reply, ECF No. 2834.

## II. LEGAL STANDARD

The plain-error standard applies when a defendant fails to object at the district court level and then seeks to bring that objection at the appellate level. *McGill*, 815 F.3d at 877. There (1) must be a legal error, (2) that legal error must be clear, and (3) that error must violate "substantial rights." *Id.* (quoting *United States v. Brown*, 508 F.3d 1066, 1071 (D.C. Cir. 2007)).

The D.C. Circuit reviewed the defendants' objections to the admission of the DEA-7 evidence under the plain-error standard. *Id.* at 890-92. The Circuit resolved the first two prongs and concluded that there was a clear legal error. *See id.* The Circuit then instructed this Court to resolve the "substantial rights" prong and specifically that "[o]n remand the burden will be on appellants to show . . . that there is a reasonable probability that, but for the improperly admitted evidence, the jury's quantity findings would have been different." *Id.* at 892. Therefore, with the

burden squarely on the defendants, this Court will "determine whether [defendants] can demonstrate that the improperly admitted drug report evidence affected the jury's drug quantity findings." *See id.*

## III.    DISCUSSION

This Court concludes that the defendants have not demonstrated that the DEA-7 evidence violated their substantial rights for two reasons.  First, the Court concludes that there is no reasonable probability that the jury would have made different quantity findings because, if faced with a proper ruling, the government would have simply introduced the DEA-7 evidence using the authoring chemists.  Second, even setting that conclusion aside, no defendant has demonstrated a reasonable probability that the admission of the DEA-7 evidence affected the jury's individualized determination as to the drug quantity attributable to him.

### A.  No Defendant Can Demonstrate That His Substantial Rights Were Violated Because the Government Would Have Simply Had the Authoring Chemists Testify

The introduction of the DEA-7 evidence could not have violated the defendants' substantial rights given the availability of the authoring chemists.  As the Supreme Court recently explained, when conducting a substantial rights inquiry, "[the] argument that plain-error review must focus exclusively on the trial record contravenes both logic and precedent."  *Greer v. United States*, 141 S. Ct. 2090, 2098 (2021).  After all, it "is not a realistic scenario" that "the Government [would] not introduce additional evidence" were it faced with a proper evidentiary ruling.  *See id.*

In *Greer*, the district court failed to give a required instruction on *mens rea*.  *Id.*  The defendant argued on appeal that plain-error review of that failure required the appellate courts to "assume a scenario where the proper instruction was given, but where the Government did not introduce additional evidence to prove" that the defendant satisfied the *mens rea* requirement.  *Id.* The Supreme Court squarely rejected that narrow view of what plain-error review allows a court

7

to consider. *Id.* A judge need not hold the trial record constant and then apply a ruling that did not occur. Instead, this Court should contemplate how the government would have reacted were the unmade objection actually lodged and sustained during trial. *See id.* Here, that objection would have been to admission of the DEA-7 evidence without testimony from the authoring chemists.

There is no reasonable probability that the jury would have made different quantity findings because, if faced with a proper ruling, the government would have simply introduced the DEA-7 evidence using the authoring chemists. *See* Appellants' Br. at 163 & n.75, *McGill*, 815 F.3d 846 (No. 06-3190), Document #1381198 (recognizing that the authoring chemists were available to testify but that the government did not call them out of convenience of presentation). This would have rendered all the improperly admitted evidence admissible under the Confrontation Clause. *See McGill*, 815 F.3d at 890. And no defendant has provided any reason to believe that testimony by the authoring chemists, as opposed to the supervisory chemist, would have resulted in different quantity findings by the jury. On that basis alone, the jury's drug quantity findings should be maintained as rendered—no defendant can demonstrate a reasonable probability of a different result.

### B. No Defendant Has Demonstrated a Reasonable Probability That the DEA-7 Evidence Affected the Jury's Drug Quantity Findings Given the Trial Record

Independent of its conclusion in Part III.A., this Court has reviewed the briefing by the defendants, as well as the government's opposition, and the trial record, to determine whether there is a reasonable probability that the jury would have reached a different result absent the DEA-7 evidence and without the government admitting additional evidence. As mentioned before, drug quantity attribution in a drug conspiracy is an "individualized" approach with a focus on "the quantity of drugs the jury attributes to [each defendant] as a reasonably foreseeable part of the

8

conspiracy." *Stoddard*, 892 F.3d at 1222 (quoting *United States v. Law*, 528 F.3d 888, 906 (D.C. Cir. 2008)).  Therefore, the Court will consider the amount of drugs connected or attributed to each defendant in the improperly admitted DEA-7 evidence as compared to the amount the jury found attributable to each defendant.  The Court will also review the trial record to consider the non-DEA-7 evidence at trial establishing the drug quantities attributable to the individual defendants.

On that basis, the Court concludes that the defendants have failed to meet their burdens.[4]

### 1.  Kenneth Simmons

The jury attributed to Kenneth Simmons 5 kilograms or more of powder cocaine, 50 grams or more of crack cocaine, and 100 grams to 1 kilogram of heroin.  ECF No. 1879 at 2-3.  The DEA-7 evidence attributed 478.3 grams of powder cocaine and 506.65 grams of crack cocaine to Kenneth Simmons.  It attributed no heroin to Kenneth Simmons.

Kenneth Simmons makes no specific argument that the evidence at trial was insufficient to establish the drug quantities for which he was convicted.[5]  However, the Court will read his motion broadly, and consider whether he has demonstrated a reasonable probability that the jury's drug quantity findings would have been different without the DEA-7 evidence.  On that basis, the Court has reviewed the government's submission, the trial record, and the D.C. Circuit's opinion, including its recognition that "there was testimony that Simmons engaged in drug transactions with Moore, Gray, Deon Oliver, Fleming, and James Alfred."  *McGill*, 815 F.3d at 892.  Taking

---

[4] The Court notes that the D.C. Circuit recently affirmed this Court's rejection of codefendant Keith McGill's identical argument regarding drug quantity.  There, the D.C. Circuit explained that codefendant Keith McGill's argument that the DEA-7 evidence "'must have [ ] influenced' the jury's finding on the quantity of drugs he conspired to distribute" was baseless and that "[t]he record contains overwhelming evidence" of the quantity of drugs for which he was responsible.  *United States v. Keith B. McGill*, No. 21-3058, 2022 WL 15604316, at *1 (D.C. Cir. Oct. 28, 2022) (summary order).

[5] Instead he argues that "[a]bsent the laboratory reports, the prosecution did not introduce sufficient evidence to prove beyond a reasonable doubt that [he] possessed a controlled substance."  Def. Kenneth Simmons Mot. 1, 4 (citing *United States v. Trotman*, 406 F. App'x 799 (4th Cir. 2011)).  The Court rejects that argument as being beyond the scope of the remand and wrong on the merits.  *Infra* Part III.C.1.

the evidence as a whole, the Court concludes that Kenneth Simmons has not met his burden to demonstrate a reasonable probability that the jury's findings would have been different absent the DEA-7 evidence.

For 5 kilograms or more of powder cocaine, the Court concludes that Kenneth Simmons has failed to meet his burden given the substantial evidence at trial and the small amount of powder cocaine attributable to him in the DEA-7 evidence compared to the jury's finding.

Maurice Andrews, a cooperator and coconspirator, testified that he was aware of Kenneth Simmons supplying Kevin Gray, a leader of the drug conspiracy, with powder cocaine three or four times, comprising one-quarter, one-half, and at least one kilogram. Transcript (October 21, 2003, PM) at 58-59, ECF No. 1893. Eventually, that relationship reversed, and Gray began supplying Kenneth Simmons. Transcript (October 21, 2003, PM) at 60. Cooperator and former coconspirator Steven Graham testified that Gray once purchased a kilogram of powder cocaine from Kenneth Simmons, before returning it due to apparent quality issues. Transcript (December 15, 2003, AM) at 79-83.

Walter Fleming, a cooperator and former coconspirator who was involved in various drug transactions, testified to a variety of powder cocaine transactions, including Kenneth Simmons passing along to Fleming an average of 2 kilograms of cocaine every two to three weeks from the end of 1996 until the Fleming's arrest in 1998. Transcript (November 17, 2003, PM) at 125-28; Transcript (November 19, 2003, AM) at 92-95. Fleming further explained that Rodney Moore, another leader of the drug conspiracy, supplied powder cocaine to Kenneth Simmons and that, after Kenneth Simmons connected Fleming and Moore, Fleming bought at least 2 kilograms of powder cocaine from Moore directly and, during other instances, bought through Simmons, including at least 3 additional kilograms of transactions. Transcript (November 17, 2003, PM)

at 130-34.  Kenneth Simmons and Fleming further bought at least 2 kilograms of cocaine from James Alfred.  Transcript (November 18, 2002, AM) at 20-21.  Graham corroborated the relationship between Fleming and Kenneth Simmons as to powder cocaine.  When Graham went to Fleming's place of business to pick up powder cocaine, Fleming would sometimes say that he needed to wait for Kenneth Simmons to deliver the cocaine.  Transcript (December 15, 2003, AM) at 23-26.  Raymond Sanders, a government cooperator, testified that Deon Oliver received powder cocaine from Kenneth Simmons.  Transcript (November 6, 2003, AM) at 21.

Given the varied and extensive testimony as to Kenneth Simmons's powder cocaine dealings, and the mere 478.3 grams linked to him in the DEA-7 evidence, Kenneth Simmons has not met his burden to establish that there is a reasonable probability that the jury would have reached a different quantity finding absent the DEA-7 evidence.

For 50 grams or more of crack cocaine the government presented substantial testimony from several witnesses more than sufficient to attribute *kilograms* of crack cocaine to Kenneth Simmons, never mind only 50 grams.  This substantial testimony renders Kenneth Simmons unable to meet his reasonable probability burden, even though the DEA-7 evidence did attribute to him more crack cocaine than the minimum amount that the jury found attributable to him.

Fleming testified that Kenneth Simmons was purchasing 3 kilograms of crack cocaine a week from him between 1994 and July 1996.  Transcript (November 17, 2003, PM) at 82-83, 105-06.  Moreover, Fleming explained that he cooked crack cocaine for Kenneth Simmons.  Transcript (November 17, 2003, PM) at 128-29.  Beyond the relationship between Fleming and Kenneth Simmons, Fleming also testified that Kenneth Simmons would supply 62-gram and 125-gram amounts of crack cocaine to Deon Oliver, Transcript (November 17, 2003, PM) at 139-40;

11

Transcript (November 19, 2003, PM) at 74, ECF No. 1906.  The same was true for Kevin Gray.

Transcript (November 17, 2003, PM) at 144-45.

Cooperator and former coconspirator Omar Wazir testified that he heard Gray state that

Gray had supplied Kenneth Simmons with powder cocaine and that Kenneth Simmons was

complaining because the cocaine was not cooking into crack cocaine properly.  Transcript

(October 28, 2003, PM) at 113-15, ECF No. 1897.

Cooperator and former coconspirator Frank Howard testified that he had personally

purchased 250 grams of crack cocaine from Kenneth Simmons.  Transcript (January 9, 2004, PM)

at 56-57, ECF No. 1921.  Cooperator and former coconspirator Bethlehem Ayele also spoke of

purchasing crack cocaine from Kenneth Simmons.  Transcript (January 20, 2004, AM) at 117-20;

Transcript (January 20, 2004, PM) at 7-10, ECF No. 1926.

Victoria Robles, Deon Oliver's girlfriend, stated that Kenneth Simmons would supply

Deon Oliver with crack cocaine as part of their business relationship.  Transcript (November 25,

2003, PM) at 143, ECF No. 1909.  She further stated that Kenneth Simmons sold crack cocaine.

*Id.*

The DEA-7 evidence attributed to Kenneth Simmons a substantial 506.65 grams of crack

cocaine.  Given the massive amount of crack cocaine attributable to Kenneth Simmons based on

specific testimony of multiple witnesses at trial, Kenneth Simmons has not established a

reasonable probability that, but for the DEA-7 evidence, the jury would have failed to attribute 50

grams or more of crack cocaine to him.

For 100 grams to 1 kilogram of heroin, the defendant has not met his burden.  First, the

DEA-7 evidence at trial connected no heroin to Kenneth Simmons at all.  That fact alone makes it

difficult for Kenneth Simmons to demonstrate a reasonable probability that the DEA-7 evidence

caused the jury to make the quantity attribution that it did. Moreover, as the D.C. Circuit recognized, evidence at trial established that "Simmons bought and sold drugs to or from Moore, Gray, James Alfred, and Oliver," *McGill*, 815 F.3d at 929, and he "owned a store that acted as a meeting place for the large conspiracy's drug deals." *Id.* Indeed, "drug transactions occurred in the store [b]asically every day, and . . . [e]verybody used to come through the store, including Moore, Gray, Oliver, and Fleming." *Id.* (internal quotation marks and citation omitted) (first and third alterations in the original). Furthermore, coconspirators supplied by Moore would distribute heroin, at the very least, in the corridor where the store was located. *See* Transcript (December 15, 2003, AM) at 31-35, 42-44. The testimony at trial provided sufficient evidence to find that distribution or possession with intent to distribute 100 grams to 1 kilogram of heroin was reasonably foreseeable to Kenneth Simmons as part of the conspiracy that he joined.

Given the absence of improperly admitted evidence linking Kenneth Simmons to heroin, along with the substantial role that Kenneth Simmons and his store played within the conspiracy's many and varied drug transactions, the defendant has not met his burden to show that there is a reasonable probability that the DEA-7 evidence affected the jury's heroin quantity finding.

Accordingly, Kenneth Simmons has not shown a violation of his substantial rights for any of the jury's quantity findings.

### 2. Ronald Alfred

The jury attributed to Ronald Alfred 5 kilograms or more of powder cocaine, 50 grams or more of crack cocaine, and 1 kilogram or more of heroin. ECF No. 1880 at 2-3. To meet his burden, Ronald Alfred argues that the government "presented very little, if any, evidence of drugs actually seized from Ronald Alfred's possession or otherwise attributable to him." Def. Ronald Alfred Mot. 5. Ronald Alfred relies on his contention that there was "scant evidence of [his] actual or constructive possession of unlawful narcotics, and lack of evidence showing he reasonably

foresaw such possession with intent to distribute amounts as a part of the conspiracy." *Id.* at 7. Finally, Ronald Alfred notes that his part in the conspiracy started around May 15, 1995. *Id.* at 4. He has nonetheless failed to meet his burden.

First, and most importantly, the improperly admitted DEA-7 evidence attributed to Ronald Alfred no drug quantities for the period comprising the relevant conspiracy.[6] Given that the purpose of the remand is to determine whether there is a reasonable probability that the improperly admitted DEA-7 evidence affected the jury's quantity findings, the lack of relevant attribution in that evidence presents a nearly insurmountable hurdle for Ronald Alfred.

Second, the D.C. Circuit has already rejected Ronald Alfred's view of the evidence, explaining that there was a "wealth of testimony" against Ronald Alfred for his conviction of drug trafficking, even absent the DEA-7 evidence. *McGill*, 815 F.3d at 947. And, of particular relevance, the D.C. Circuit specifically approved the jury's attribution to Ronald Alfred of 50 or more grams of crack cocaine.[7] The Circuit further explained that testimony showed that "Ronald Alfred supplied Gray with drugs and vice-versa." *Id.* at 892.

The lack of improperly admitted evidence relevant to the jury's quantity finding, and the D.C. Circuit's own analysis, rebut Ronald Alfred's briefing and demonstrate that he has not met his burden. However, for the sake of completeness, the Court will also discuss the evidence in the trial record that refutes Ronald Alfred's argument.

---

[6] Instead, it attributed to Ronald Alfred 997.9 grams of powder cocaine from 1989, and the jury was instructed not to return any verdicts against Ronald Alfred for that time period. *See, e.g.*, Transcript (November 4, 2003, AM) at 40-41.

[7] "Here, sufficient evidence supported [Ronald] Alfred's conviction even without lab analysis. Testimony was presented showing that Alfred's close associates were involved in trafficking crack cocaine, including his brother James, who was said to be Ronald Alfred's middleman in drug transactions. Evidence also showed that the conspiracy as a whole participated in crack cocaine transactions. Such evidence, along with the wealth of testimony regarding Alfred's own drug trafficking, supports the jury's attribution of 50 or more grams of trafficked crack cocaine to Ronald Alfred as a reasonably foreseeable part of the conspiracy he joined." *McGill*, 815 F.3d at 947 (citing *Law*, 528 F.3d at 906).

For 5 kilograms or more of powder cocaine, the testimony of cooperator and former coconspirator Maurice Andrews provides substantial specific evidence to support the jury's finding. Andrews testified that, over the course of approximately three years, Ronald Alfred supplied Kevin Gray with 125 grams of powder cocaine twice a week. Transcript (October 21, 2003, AM) at 156-58. Ronald Alfred would also gift drugs, like powder cocaine, to Gray. Transcript (October 21, 2003, PM) at 49. Moreover, the jury heard testimony that Ronald Alfred introduced Gray to a new supplier and coconspirator, Lionell Nunn, who proceeded to supply powder cocaine to Gray in November 1998. Transcript (October 21, 2003, PM) at 145-47.

This evidence from trial further demonstrates that Ronald Alfred has failed to meet his burden as to powder cocaine.

For 50 or more grams of crack cocaine, the D.C. Circuit already approved the jury's finding based on the testimony at trial that James Alfred was a middleman for his brother Ronald. Transcript (October 21, 2003, AM) at 85-86; *see McGill*, 815 F.3d at 947 ("[Ronald Alfred's] brother James, [] was said to be Ronald Alfred's middleman in drug transactions. . . . [The evidence] supports the jury's attribution of 50 or more grams of trafficked crack cocaine to Ronald Alfred as a reasonably foreseeable part of the conspiracy he joined."). Given that the government has demonstrated that testimony at trial supports attributing several *thousand* grams of crack cocaine to James Alfred, there is no reasonable probability that the finding as to Ronald Alfred would have changed absent the DEA-7 evidence. *See infra* Part III.B.3.

In light of the D.C. Circuit's specific discussion of crack cocaine attribution for Ronald Alfred, the testimony at trial, the lack of crack cocaine attribution in the improperly admitted evidence, and the omission of any effective argument otherwise by Ronald Alfred in his brief, this Court concludes that Ronald Alfred has not met his burden for crack cocaine.

For 1 kilogram or more of heroin, the government admitted relevant testimony from several witnesses.

Andrews testified that Gray would purchase two to three ounces of heroin at a time from Ronald Alfred, heroin that James Alfred would sometimes deliver. Transcript (October 21, 2003, AM)) at 85-86. Andrews's testimony supports the conclusion that, at the very least, this weekly delivery continued from mid-1995 to November 1998. Transcript (October 21, 2013, AM) at 156-58. Andrews further testified to a one-ounce gift from Ronald Alfred to Gray. Transcript (October 21, 2003, PM) at 49. And, after Ronald Alfred introduced Lionell Nunn, Nunn began supplying quantities of heroin to Gray. Transcript (October 21, 2013, PM) at 145-47. Andrews also testified that "[e]very once in awhile we would be getting ounces of heroin from [Ronald Alfred]." Transcript (October 21, 2003, PM) at 137.

In his testimony, Fleming corroborated Kevin Gray's heroin relationship with Ronald Alfred. Fleming testified that in 1997, Gray told Fleming that Gray was getting heroin from Ronald Alfred. November 18, 2003, AM, at 27-28. Meanwhile, Omar Wazir testified that Ronald Alfred was sometimes supplied with heroin by Gray, with purchases in 200-gram units. Transcript (October 28, 2003, PM) at 119. Frank Howard testified that Gray would supply Ronald Alfred with heroin at least three times a week for approximately one year. Transcript (January 9, 2004, PM) at 53-54. Finally, Steven Graham testified that Gray supplied Ronald Alfred with 100 grams of heroin two to three times a week. Transcript (December 15, 2003, PM) at 12-16, ECF No. 1914.

Cooperator and former coconspirator Caprice Whitley testified that Ronald Alfred induced her into acting as a drug courier moving heroin into the United States. Transcript (November 24, 2003, PM) at 84-93, ECF No. 1908. He supplied the money and Caprice proceeded to bring in ten packages of 100 grams of heroin. *Id.*

Given the absence of any improperly admitted DEA-7 evidence on the subject, the D.C. Circuit's discussion, and the trial testimony, Ronald Alfred has failed to meet his burden for the jury's heroin quantity finding.

Accordingly, Ronald Alfred has not shown a violation of his substantial rights for any of the jury's quantity findings.

### 3. James Alfred

The jury attributed to James Alfred 5 kilograms or more of powder cocaine, 50 grams or more of crack cocaine, and 1 kilogram or more of heroin. ECF No. 1881 at 2-3. James Alfred argues that "the government's trial evidence regarding quantities of controlled substances was not limited to the improperly-admitted evidence, [but] that evidence was critical to the government's case against [him]." Def. James Alfred Br. 5. That is particularly true, he contends, because he did not join the conspiracy until May 1995. *Id.* at 6. And he argues that the testimony at trial was impermissibly vague and imprecise such that there is a reasonable probability the jury's drug quantity conclusion would have been different but for the DEA-7 evidence. *Id.* at 6-9. James Alfred also provides detailed witness-by-witness reasons why the government's evidence, without the DEA-7 evidence, was insufficient. *Id.* Nevertheless, he has failed to demonstrate a reasonable probability of different drug quantity findings absent the DEA-7 evidence.

First, and most importantly, the improperly admitted DEA-7 evidence attributed *no* drugs to James Alfred for any category. This is a significant roadblock to James Alfred being able to meet his burden. He attempts to navigate past this impediment by claiming that the drug reports were "critical" because the jury would have wondered where the conspiracy's seized drugs were, Def. James Alfred Br. 5; Def. James Alfred Reply 2, and classified that evidence as being of a different character than cooperator testimony. Def. James Alfred Reply 2. The Court rejects this argument. As discussed below, significant and detailed testimony described the extent of the

narcotics conspiracy as well as James Alfred's role in it. The D.C. Circuit further affirmed the jury's substantive convictions, even without the DEA-7 evidence, and rejected the defendants' argument that such evidence was critical to the jury's conspiracy finding. *See McGill*, 815 F.3d at 892, 946-47. And this Court notes again that the D.C. Circuit's opinion linked James Alfred's activities to those of his brother when it stated "[t]estimony was presented showing that [Ronald] Alfred's close associates were involved in trafficking crack cocaine, including his brother James, who was said to be Ronald Alfred's middleman in drug transactions." *McGill*, 815 F.3d at 947.

The absence of relevant DEA-7 evidence attributing drug quantities to James Alfred and the D.C. Circuit's discussion alone demonstrate that he has failed to meet his burden. However, for the sake of completeness, the Court will also review the substantial trial testimony as to the drug quantities attributable to James Alfred. That testimony only further reinforces that there is no reasonable probability of different drug quantity findings absent the DEA-7 evidence.

For 5 kilograms of powder cocaine, substantial testimony detailed the quantity of cocaine properly attributable to James Alfred through his participation in the conspiracy.

Andrews testified that, sometime after approximately November 1998, James Alfred's source for powder cocaine was Gray. Transcript (October 21, 2013, PM) at 139-40, 145-49. He further testified to an additional situation when Gray delivered 375 grams of cocaine to James Alfred. Transcript (October 22, 2003, PM) at 24-33, ECF No. 1894. Cooperator and former coconspirator Melvin Wallace testified that, on another occasion, Gray had provided 125 grams of cocaine to James Alfred. Transcript (January 6, 2004, AM), at 40-42. All of this testimony was bolstered with wiretap calls, during which James Alfred called Gray and asked about the cocaine that Gray had available. Transcript (October 22, 2013, PM) at 37-38, 41-42, 47.

James Alfred responds to this evidence by arguing "that Gray was becoming increasingly frustrated with James Alfred's inability to pay" that "Gray started telling James Alfred he had no drugs when, in fact, he did" and finally that "James Alfred was not part of the 'crew,' he was only a customer." Def. James Alfred Br. 6-7; Def. James Alfred Reply 3-4. Nevertheless, the evidence at trial established the relationship of supply and delivery between James Alfred and Gray. Even if that relationship frayed over time, the jury convicted James Alfred of being part of the larger drug conspiracy and the D.C. Circuit did not disturb that conclusion, *see McGill*, 815 F.3d at 890-92, nor does the evidence detailed suggest otherwise.

Furthermore, Omar Wazir testified to James Alfred's involvement with powder cocaine. Wazir explained that he observed James Alfred sell cocaine and that James Alfred had told him that he sold cocaine, previously in wholesale quantities. Transcript (October 28, 2003, PM) at 54-56. According to Wazir, James Alfred would keep his cocaine in a store in quantities of 125 grams to 1 kilogram. Transcript (October 28, 2003, PM) at 68. Wazir once personally observed James Alfred sell 1 kilogram of cocaine, the largest amount that he witnessed James Alfred sell. Transcript (October 28, 2003, PM) at 54-56, 71. He also observed James Alfred with 2 to 3 kilograms in his car. Transcript (October 28, 2003, PM) at 71.

Walter Fleming testified that he and Kenneth Simmons together purchased 2 kilograms of cocaine from James Alfred on one occasion. Transcript (November 18, 2003, AM) at 20-23.

In sum, there is a substantial amount of specific testimony detailing James Alfred's dealings with powder cocaine, directly involving multiple members of the charged conspiracy. The quantities detailed in the testimony support the jury's finding of more than 5 kilograms of cocaine. And the DEA-7 evidence did not attribute any cocaine to James Alfred at all. Especially taken together, James Alfred has failed to meet his burden as to powder cocaine.

For 50 grams or more of crack cocaine, it is important to again note the D.C. Circuit's conclusion that "[t]estimony was presented showing that [Ronald] Alfred's close associates were involved in trafficking crack cocaine, including his brother James, who was said to be Ronald Alfred's middleman in drug transactions. *McGill*, 815 F.3d at 947; *see* Transcript (October 21, 2003, AM), at 85-86.

Wazir testified that he personally observed James Alfred sell crack cocaine multiple times and that the largest amount at one time was 250 grams. Transcript (October 28, 2003, PM) at 70. He also testified that he observed people cook crack cocaine for James Alfred, including one occasion when he watched someone cook 1 kilogram of cocaine into crack cocaine on behalf of James Alfred. Transcript (October 28, 2003, PM) at 73-74, 77-79. Moreover, Wazir observed the drug-related relationship between James Alfred and Gray, once watching as Gray gave James Alfred 125 grams of crack cocaine. Transcript (October 28, 2003, PM) at 123-25. And Fleming testified that he delivered 62 grams or 125 grams of crack cocaine to James Alfred at least ten times. Transcript (November 18, 2003, AM) at 17-19.

That testimony establishes far more than the amount that the jury needed to attribute to James Alfred. The lack of DEA-7 evidence, and the D.C. Circuit's discussion of James Alfred as a middleman for his brother's crack cocaine sales, confirm that James Alfred has not met his burden.

For 1 kilogram or more of heroin, there is, once again, significant trial evidence establishing the attributable quantity, particularly given James Alfred's role as a middleman for his brother.

First, Andrews testified that Gray would purchase two to three ounces of heroin at a time from Ronald Alfred, heroin that James Alfred would sometimes deliver. Transcript (October 21,

2003, AM) at 85-86.    At the very least, those deliveries continued from mid-1995 to November 1998.  Transcript (October 21, 2013, AM) at 156-58.  Separately, Wazir testified that he personally observed James Alfred sell heroin.  Transcript (October 28, 2003, PM) at 90-92, 102-06.  And, James Alfred would also provide heroin to Wazir on occasion.   Transcript (October 28, 2003, PM) at 92-94.  Given James Alfred's role in his brother's heroin operations, as established by trial testimony, this quantity provides more than enough basis to conclude that he should be attributed several kilograms of heroin, never mind the single kilogram necessary for the jury's attribution finding.  Considering the absence of DEA-7 evidence for heroin, and the trial testimony as to James Alfred's role in heroin sales, James Alfred has not met his burden.

Given the absence of improperly admitted DEA-7 evidence attributing to James Alfred any drug quantities, the D.C. Circuit's discussion of his role, and the trial testimony, James Alfred has not shown a violation of his substantial rights for any of the jury's quantity findings.[8]

### 4.  Franklin Seegers

The jury attributed to Franklin Seegers 500 grams to 5 kilograms of powder cocaine, 50 grams or more of crack cocaine, and 100 grams to 1 kilogram of heroin.  ECF No. 1963 at 2.

Franklin Seegers argues that the government presented "scant evidence regarding the quantity of drugs allegedly attributable to [him]" during his involvement in the conspiracy.  Def. Franklin Seegers Mem. 12.  He also argues that the improperly admitted DEA-7 evidence had a "spillover effect" from the jury's cocaine and heroin quantity findings, into their cocaine base findings.  *Id.* at 13.

---

[8] This Court notes James Alfred's specific objection to crediting Frank Howard's testimony given that much of the conduct Frank Howard described for James Alfred occurred before May 15, 1995, which is when the government agrees James Alfred joined the conspiracy.  Def. James Alfred Br. 7 n.2; Gov't Opp'n 22 n.6.  Out of an abundance of caution, this Court has not relied on Howard's testimony when considering the drug quantities for James Alfred.

The DEA-7 evidence attributed 28.255 grams of powder cocaine, 1.751 grams of crack cocaine, and 25.94 grams of heroin to Franklin Seegers. Those amounts are less than the quantity that the jury found was attributable to him. Given that the improperly admitted testimony alone could not have established the jury's quantity findings, the jury must have credited other evidence presented at trial to come to its final quantity determinations. The Court will now review that trial testimony to determine whether Franklin Seegers has met his reasonable probability burden.

For 500 grams to 5 kilograms of powder cocaine, the combination of the testimony at trial regarding Franklin Seegers's role in the conspiracy, alongside the small amount of powder cocaine attributed to him in the DEA-7 evidence, together establish that he has not met his burden.

Eugene Williams testified that Pee Wee Oliver, a coconspirator, ran a variety of drug sales out of Williams's house. Transcript (November 13, 2003, AM) at 96-106. According to Williams, Franklin Seegers supervised and oversaw Pee Wee Oliver, and the various drugs moving in out of the house. Transcript (November 13, 2003, AM) at 116-19; Transcript (November 13, 2003, PM) at 25-26, 32, 49-50, ECF No. 1904. Franklin Seegers stayed at Williams's home every day to act as Pee Wee Oliver's "overseer, watcher, keeper, bodyguard." Transcript (November 13, 2003, AM) at 116-19; Transcript (November 13, 2003, PM) at 25-26, 32, 49-50. The D.C. Circuit agreed that the trial testimony established "that Seegers was employed as Pee Wee Oliver's 'overseer' or 'bodyguard.'" *McGill*, 815 F.3d at 892.

 The sales run by Pee Wee Oliver that were overseen by Franklin Seegers ran nearly twenty-four hours a day. Transcript (November 13, 2003, AM) at 96-106, 116-19. And when other conspirators, like Rodney Moore, gathered at the house, Franklin Seegers participated in the meetings. Transcript (November 13, 2003, AM) at 106-07, 120-21. Furthermore, Rodney Moore,

a ringleader of the drug conspiracy, would supply Franklin Seegers with both money and drugs. Transcript (October 21, 2003, PM) at 65-66.

Given that the DEA-7 evidence only attributed to Franklin Seegers approximately 28 grams of the 500 grams or more of powder cocaine that the jury found attributable to him, alongside the testimony at trial regarding Franklin Seegers's substantial role within the conspiracy, he has failed to demonstrate a reasonable probability that the improperly admitted evidence led the jury to make its finding as to the amount of powder cocaine attributable to Franklin Seegers.

For the 50 grams or more of crack cocaine, testimony at trial established that Pee Wee Oliver was the crack cocaine ringleader for the conspiracy and that Seegers oversaw Oliver. Transcript (November 13, 2003, AM) at 96-96, 105-06; *McGill*, 815 F.3d at 892. The crack cocaine sales run by Pee Wee Oliver were substantial, totaling $2,000 to $3,000 a day. Transcript (November 13, 2003, AM) at 109. Furthermore, Williams testified that Franklin Seegers would sell crack cocaine and that dealers, including Williams, would source their crack cocaine from Franklin Seegers and those who worked for him. Transcript (November 13, 2003 AM) at 126-27.

Given the paltry 1.751 grams of crack cocaine attributed to Franklin Seegers in the DEA-7 evidence, alongside the trial testimony that he was the overseer and bodyguard for the crack cocaine ringleader of the conspiracy, Franklin Seegers has failed to demonstrate a reasonable probability that the jury would have made a different crack cocaine quantity finding absent the improperly admitted evidence.

For the 100 grams to 1 kilogram of heroin, Williams testified that members of the drug conspiracy were selling heroin out of his house and said that he found "a few 10-packs of heroin" with each individual bag containing "a couple of tenths of a gram" of heroin. Transcript (November 13, 2003, AM) at 107-11. Williams testified that Franklin Seegers was at the house

23

where they sold heroin every day, overseeing Pee Wee Oliver. Transcript (November 13, 2003, AM) at 116-19; Transcript (November 13, 2003, PM) at 25-26, 32, 49-50. Furthermore, Franklin Seegers's former coconspirator, Maurice Andrews, testified that Moore was supplying Franklin Seegers with both money and drugs. *See* Transcript (October 21, 2003, PM) at 65-66.

Given this trial testimony, and the mere 25.94 grams of heroin attributed to him in the DEA-7 evidence, Franklin Seegers has failed to meet his burden to demonstrate that the jury's heroin quantity finding would have been different absent the DEA-7 evidence.

In sum, Franklin Seegers has failed to meet his burden to demonstrate a reasonable probability that the improperly admitted DEA-7 evidence caused the jury to make the quantity findings that it did. Considering that the DEA-7 evidence attributed to Franklin Seegers mere fractions of the drug quantities found by the jury, alongside the evidence regarding Franklin Seegers's role in the conspiracy, he has failed to demonstrate a violation of his substantial rights.

### 5. Deon Oliver

The jury attributed to Deon Oliver 5 kilograms or more of powder cocaine and 50 grams or more of crack cocaine. ECF No. 1882 at 2.

Deon Oliver argues that the testimony at trial, without the DEA-7 evidence, was insufficient for the jury to establish an attributable drug quantity. Def. Deon Oliver Br. 3-7. Deon Oliver further asserts that the DEA-7 evidence was "critical" and that the testimony was insufficiently specific. Def. Deon Oliver Reply 4-7. However, the argument is belied both by the testimony at trial and the lack of DEA-7 evidence connected to Deon Oliver: nothing for powder cocaine and a mere 12.8 grams for crack cocaine. And as the D.C. Circuit noted, "there was testimony that . . . Deon Oliver sold drugs he obtained from Simmons and Moore." *McGill*, 815 F.3d at 892.

For 5 kilograms or more of powder cocaine, Maurice Andrews testified that Deon Oliver would sell drugs supplied by three members of the drug conspiracy: Rodney Moore, Kenneth Simmons, and Kevin Gray. Transcript (October 21, 2003, PM) at 53-54, 63-64. Cooperator and former coconspirator Raymond Sanders testified that one of the drugs Kenneth Simmons in particular supplied to Deon Oliver was powder cocaine. Transcript (November 6, 2003 AM) at 21. Walter Fleming testified that on one occasion, he, Kenneth Simmons, Rodney Moore, and Deon Oliver gathered at Deon Oliver's apartment to handle 1 kilogram of powder cocaine obtained by the conspiracy. Transcript (November 17, 2003, PM) at 134-38.

Given the lack of DEA-7 evidence linking Deon Oliver to powder cocaine, and reinforced by the testimony detailing his role in the conspiracy, he has failed to meet his burden as to powder cocaine.

For 50 grams or more of crack cocaine, Fleming testified that Kenneth Simmons supplied Deon Oliver with 62-gram and 125-gram quantities of crack cocaine. Transcript (November 17, 2003, PM) at 139-40; Transcript (November 19, 2003, PM) at 74. Fleming further testified that he cooked powder cocaine into crack cocaine on behalf of Kenneth Simmons and that he was sometimes told the final crack cocaine was for Deon Oliver. Transcript (November 19, 2003, PM) at 74. This testimony was bolstered by Caprice Whitley, who testified that she had seen defendant Kenneth Simmons provide Deon Oliver drugs, while Deon Oliver would give Kenneth Simmons money. Transcript (November 24, 2003, PM) at 124. Furthermore, during the aforementioned episode in Deon Oliver's apartment, 1 kilogram of powder cocaine was turned into more than a kilogram of crack cocaine. Transcript (November 17, 2003, PM) at 134-38.

Deon Oliver's girlfriend, Victoria Robles, testified that Deon Oliver sold crack cocaine. Transcript (November 25, 2003, PM) at 142-43, 149-50. Deon Oliver also confirmed that he had received crack cocaine previously. Transcript (February 5, 2004, AM) at 85-87.

Given this substantial evidence, and the small amount of crack cocaine linked to him in the DEA-7 evidence, Deon Oliver has failed to meet his burden as to crack cocaine.

In sum, Deon Oliver has failed to show a violation of his substantial rights.

### C. The Defendants' Other Arguments Are Without Merit

This Court will now address several additional arguments made by the defendants. All are without merit.

First, Kenneth Simmons argues that this Court must vacate his substantive convictions because, without the DEA-7 evidence, there was insufficient evidence that he was part of a narcotics conspiracy. Def. Kenneth Simmons Mot. 1-6. Similarly, Ronald Alfred, Deon Oliver, and James Alfred argue that their drug conspiracies convictions are jeopardized because the government presented little evidence of drugs seized from them. Def. Ronald Alfred Mot. 5; Def. Deon Oliver Br. 3-5; Def. James Alfred Br. 5.

Second, several defendants ask to be resentenced on the Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy counts of which they were convicted. Def. Kenneth Simmons Mot. 6-7; Def. Franklin Seegers Mem. 14; Def. Deon Oliver Br. 7.

Third, several defendants argue that, under two D.C Circuit cases, testimony by cooperating witnesses alone cannot establish drug quantities without drug analyses. Def. Ronald Alfred Mot. 5-8; Def. James Alfred Br. 5-6; Def. James Alfred Reply; Def. Deon Oliver Br. 4; Def. Deon Oliver Reply 4.

### 1. This Court Will Not Vacate Defendants' Substantive Drug Conspiracy Convictions

Kenneth Simmons argues that this Court should vacate his substantive drug conspiracy conviction because, without the DEA-7 evidence, there is a reasonable probability that the jury would not have found him guilty of the drug conspiracy. *See* Def. Kenneth Simmons Mot. 1-6. Several other defendants at least allude to the same claim. *See* Def. Ronald Alfred Mot. 5; Def. Deon Oliver Br. 3-5; Def. James Alfred Br. 5.

The defendants' arguments are foreclosed here because the D.C. Circuit already rejected them. On appeal, defendants argued that "apart from the improperly admitted drug report evidence, 'there was no tangible proof, other than testimony by highly impeached cooperating witnesses, as to the nature and scope of the conspiracies at all.'" *McGill*, 815 F.3d at 891 (quoting Appellants' Br. at 164). The D.C. Circuit considered and rejected that argument, writing that defendants "ha[d] not carried [their] burden as to any elements except (possibly) drug quantity." *Id.* at 892. The Circuit continued, saying, "given the nature of the behavior described by the cooperating witnesses, the jurors could not have believed that appellants were going through the elaborate transactions and precautions described, and exchanged the funds described, for any reason other than conspiracy to distribute and possess narcotics." *Id.*

Under the D.C. Circuit's holding, the question put to this Court on remand is simply "whether the admission of the drug report evidence affected the jury's findings as to the *quantities* of drugs involved in the charged conspiracies and, if so, which counts or quantity findings (if any) must be vacated with respect to each appellant." *Id.* (emphasis in the original). The Circuit held "that the Confrontation Clause violations were not prejudicial in any other respect." *Id.* Therefore, this Court will not vacate Kenneth Simmons's substantive conviction, nor those of any other defendant. *See Briggs v. Pennsylvania. R. Co.*, 334 U.S. 304, 306 (1948) ("[A]n inferior court has

no power or authority to deviate from the mandate issued by an appellate court."); *Am. Council of Blind v. Mnuchin*, 977 F.3d 1, 5 (D.C. Cir. 2020).

Even if the question were properly before this Court, the defendants' arguments fail on the merits. The defendants could not meet their burden to show that there is a reasonable probability that the jury would not have convicted them of the drug conspiracy without the DEA-7 evidence because there was "overwhelming evidence" as to the defendants' guilt. *McGill*, 815 F.3d at 947; *see id.* at 892 (detailing the evidence at trial proving "appellants' participation in the conspiracy and drug dealing," even absent the DEA-7 evidence); *id.* at 947 (affirming Ronald Alfred's conviction "even without lab analysis" because of the "wealth of testimony" regarding his participation in the drug trafficking conspiracy); *supra* Part III.B. And drug analysis reports, or physical evidence of drugs seized, are not necessary to convict defendants of a drug conspiracy. *McGill*, 815 F.3d at 946 ("laboratory analysis is just one of many ways in which involvement with narcotics can be proven; circumstantial evidence alone can also suffice") (citing *United States v. Baugham*, 449 F.3d 167, 171-72 (D.C. Cir. 2006)). There was overwhelming evidence at trial of these defendants' participation in the drug conspiracy that the jury convicted them of and there is no reason to set that finding aside.

Based on the limited scope of the remand here, or alternatively on the merits, this Court concludes that the defendants' substantive drug conspiracy convictions should not be vacated.

### 2. This Court Will Not Vacate Defendants' RICO Conspiracy Convictions

Several defendants argue that their RICO conspiracy convictions were disturbed by the D.C. Circuit's ruling on the Confrontation Clause violation. Def. Kenneth Simmons Mot. 6-7; Def. Franklin Seegers Mem. 14; Def. Deon Oliver Br. 7; Def. Deon Oliver Reply 6-7. That argument is without merit.

First, the Circuit rejected defendants' argument that the improperly admitted DEA-7 evidence required "vacatur of their . . . RICO conspiracy convictions." *McGill*, 815 F.3d at 890-92.  Second, no defendant has explained how different quantity findings would affect their RICO conspiracy convictions.  Third, because the defendants have not shown a reasonable probability of different quantity findings, there cannot be any effect on the defendants' RICO conspiracy convictions.  *Supra* Part III.B.

No matter how the issue is sliced, the defendants' RICO conspiracy convictions have not been disturbed by the D.C Circuit's ruling and will not now be disturbed by this Court.

### 3. Several Defendants Wrongly Rely on the D.C. Circuit's *Fields* Cases to Assert that Drug Quantity Cannot be Established Without Seized Drugs

More directly responsive to the remand, several defendants argue that the D.C. Circuit's rulings in *United States v. Fields*, 242 F.3d 393, 396 (D.C. Cir. 2001) ("*Fields I*") and *United States v. Fields*, 251 F.3d 1041, 1043 (D.C. Cir. 2001) ("*Fields II*") preclude a jury finding on drug quantity based solely on cooperator testimony without drug analysis evidence.  *See* Def. Ronald Alfred Mot. 5-8; Def. James Alfred Br. 5-6; Def. James Alfred Reply; Def. Deon Oliver Br. 4; Def. Deon Oliver Reply 4.  Their view overreads those cases.

*Fields I* requires that a jury, before convicting a defendant of drug conspiracy charges, find that the government proved the drug type and quantity beyond a reasonable doubt.  242 F.3d at 396 ("[T]he Government must state the drug type and quantity in the indictment, submit the required evidence to the jury, and prove the relevant drug quantity beyond a reasonable doubt.").  There, the jury never found any drug quantity amounts at all because the verdict form failed to include a section to make such a finding.  *See id.*

On rehearing, the D.C. Circuit expanded on *Fields I* and explained that "imprecise" and "vague testimonial evidence" might be insufficient on plain-error review to establish drug quantity

amounts not found by a jury. *Fields II*, 251 F.3d at 1045. Examples of such testimony include descriptions like "'[the defendant] made a living selling crack,' sold or supplied marijuana to ten named individuals, 'worked selling marijuana four to five days a week,' and 'had no idea how much marijuana he had sold.'" *Id.* The cases, however, do not stand for the proposition that testimony from coconspirators are never sufficient to maintain quantity findings. They merely hold that a court must be careful to consider the evidence thoroughly to determine whether defendants have demonstrated a violation of substantial rights based on the legal error made.

The defendants' situation is clearly distinguishable from *Fields I and II*. There, the jury never found any drug quantity amounts at all because the verdict form failed to include a section to make such a finding. *See Fields I*, 242 F.3d at 396. In that circumstance, the evidence was insufficient to ensure that the failure to ask the jury about drug quantities "did not 'seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings.'" *Fields II*, 251 F.3d at 1045 (citation omitted) (alteration in the original). By contrast, the jury here made the required findings as to quantity. *See supra* Part III.B. This Court is only evaluating whether the *improperly admitted evidence* violated substantial rights, unlike a judge made to consider whether a *complete failure* to ask the jury to identify attributable quantities violated substantial rights.

Moreover, unlike *Fields II*, which rejected testimony from witnesses who could not sufficiently establish drug quantities, the government here presented numerous "cooperating witnesses [who] testified to appellants' participation in the conspiracy and drug dealing in depth and at length." *McGill*, 815 F.3d at 892. This Court has reviewed the trial record and weighed the possible effect of the improperly admitted evidence against the strong, varied, and specific testimony at trial supporting both guilt on the substantive charges as well as the individual quantity findings made by the jury. Consequently, *Fields I* and *Fields II* do not support the defendants—

applying the principles underlying those opinions, it is apparent that no defendant has established

a reasonable probability that, but for the DEA-7 evidence, the jury would have made different drug

quantity findings.

*      *      *

Because no defendant has shown a violation of substantial rights based on the admission

of the DEA-7 evidence, this Court has no cause to consider resentencing any defendant except

Franklin Seegers, who will be resentenced based on the government's concession that he should

be resentenced on Count 49[9] and the D.C. Circuit's reversal of two of his substantive convictions.

*See McGill*, 815 F.3d at 890, 947. The defendants' other arguments related to the D.C. Circuit's

remand for improper admission of the DEA-7 evidence are without merit.

## IV.    CONCLUSION

For the forgoing reasons, the Court concludes that the defendants have failed to meet their

burden and therefore will **DENY** the defendants' request for resentencing based on the improper

admission of the DEA-7 evidence. The Court will resentence Franklin Seegers based on the

government's concession and the D.C. Circuit's specific reversal of two charges for possession

with intent to distribute cocaine and heroin. The remanded ineffective assistance of counsel claims

by Kenneth Simmons and Ronald Alfred are still before the Court.

A separate order will issue.


Date: November 22, 2022

Royce C. Lamberth
United States District Judge

---

[9] The government stated that it does not oppose Franklin Seegers's request because he was sentenced to 360 months for Count 49 of the indictment, ECF No. 2327 at 3, but the statutory maximum is ten years, 18 U.S.C. § 1959(a)(5). Gov't Opp'n 65-66. Franklin Seegers's COVID-related request regarding conditions of confinement will be denied for failure to demonstrate exhaustion of administrative remedies. *See* Def. Franklin Seegers Mem. 16-19; 18 U.S.C. § 3582(c)(1)(A).